IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT | : | |
| OF CHRISTOPHER COLUMBUS, LLC | : | |
| (t/a BEN FRANKLIN YACHT), AS | : | CIVIL ACTION NO. 14-214 |
| OWNER OF THE VESSEL BEN | : | |
| FRANKLIN YACHT FOR | : | |
| EXONERATION FROM OR LIMITATION | : | |
| OF LIABILITY | : | |

## MEMORANDUM OPINION

Smith, J.                                                                          March 30, 2016

The parties in this purported admiralty law case have presented the court with a fascinating legal question.  After being sued for tort liability in state court, the owner of the Ben Franklin Yacht filed a petition in this court pursuant to the Limitation of Liability Act ("Limitation Act"), 46 U.S.C. §§ 30501-30512, seeking exoneration from or limitation of any potential liability.  Seemingly basing jurisdiction solely on the basic grant of admiralty jurisdiction, 28 U.S.C. § 1333(1), a grant that gives exclusive jurisdiction to federal courts in certain circumstances, the owner of the vessel subsequently obtained a preliminary stay of all outstanding state court actions that it was involved in (as is normal in a limitation proceeding). Seizing on the savings clause in the admiralty statute, one of the parties suing the owner in state court now requests that this court send the underlying dispute, which primarily centers on an alleged fight between patrons that erupted during a night cruise, back to state court.  To resolve this forum-selection issue, an issue that has significant consequences with respect to the identity of the factfinder, the parties invite the court to take a fresh look at the "recurring and inherent conflict" between grounding a limitation proceeding in exclusive admiralty jurisdiction and ensuring that the exclusivity of that jurisdiction does not render the savings clause meaningless.

*Gorman v. Cerasia*, 2 F.3d 519, 524 (3d Cir. 1993) (internal quotation marks and citation omitted).

With much regret, especially given the parties' excellent efforts in attempting to reconcile this challenging conflict, the court is compelled to decline the invitation. Any need to reconcile this conflict arises only if the conflict actually exists. And a conflict actually exists only if there is a possibility that the admiralty statute is a viable jurisdictional option (for it is then that the exclusivity of federal jurisdiction comes into play). Because any reasonable reading of the factual record forecloses that option, there is nothing to reconcile. In fact, and with that option taken off the table, the court's path is conflict-free; the court must dismiss the instant limitation petition for want of subject-matter jurisdiction.

## I.     PROCEDURAL HISTORY

The underlying dispute became the subject of judicial concern on September 20, 2013, when Michael Bocchino ("Bocchino") filed suit in the Court of Common Pleas of Philadelphia County against, among other defendants, the Ben Franklin Yacht. *See* Compl. for Exoneration From or Limitation of Liability ("Compl.") at Ex. A, Doc. No. 1-1. In that action, Bocchino essentially alleged that the Ben Franklin Yacht and its owner were liable for injuries that he sustained in a fight that erupted between patrons of the vessel during an evening cruise. *See id.* at ¶¶ 8, 25. Bocchino advanced both intentional tort and negligence theories of liability. *See id.* at Counts I-IV. After responding to the complaint in state court, the owner of the Ben Franklin Yacht, namely Christopher Columbus, LLC ("Christopher Columbus"), filed the instant limitation petition asking this court to either exonerate it from liability or, in the alternative, limit its liability to the value of its interest in the vessel. *See* Compl. at ¶¶ 18-19. In compliance with the Limitation Act and Supplemental Admiralty Rule F, the court both stayed the state court

action and ordered that notice be sent "to all persons asserting claims with respect to which the complaint seeks limitation." Fed. R. Civ. P. Supp. R. F(4); *see* 46 U.S.C. § 30511(c); Order, Doc. No. 6.[1]  On June 13, 2014, Bocchino filed his initial claim in the limitation proceeding. *See* Claim of Michael Bocchino, Doc. No. 11.

        In his first attempt to get the underlying dispute sent back to state court, Bocchino filed a motion to obtain relief from the stay. *See* Mot., Doc. No. 16.  Eventually, Bocchino withdrew the motion and the court denied it as moot and without prejudice to its refiling at a later date. *See* Order, Doc. No. 23.  At around the same time, other parties having a relation to state court litigation involving the underlying dispute began to file claims in this proceeding. Concomitantly, the court stayed any additional state court actions involving the underlying dispute. *See* Orders, Doc. Nos. 25, 40.  On June 11, 2015, Bocchino filed an amended claim, the primary purpose of which was to add a dram shop theory of liability. *See* Am. Claim of Michael Bocchino, Doc. No. 46.  Christopher Columbus also filed various counterclaims.

        Representing his second attempt at getting this dispute resolved by a state court, Bocchino filed a motion for partial summary judgment on September 3, 2015, after the completion of a significant amount of discovery. *See* Mot. for Partial Summ. J., Doc. No. 61.  In that motion, he argued that, given the factual record developed through discovery, the court should dismiss the instant limitation proceeding pursuant to the savings clause in the admiralty statute and allow a state court jury to ultimately resolve the issue of liability. *See id.* at ¶ 3.  In addition to responding to Bocchino's motion, Christopher Columbus filed a motion for summary judgment of its own, in which it implicitly asserted that this court should rule on the issue of liability and explicitly contended that, on the issue of liability, the court should find none. *See*

---

[1] At that time, the Honorable William H. Yohn, Jr. presided over this matter.  On April 28, 2014, the Honorable Petrese B. Tucker reassigned this matter to the undersigned. *See* Order, Doc. No. 8.

Mot. for Summ. J. at ¶ 6, Doc. No. 67.  In admirable fashion, the parties fully briefed the issues appearing in the cross-motions for summary judgment.  The court heard argument from the parties on October 28, 2015, and took the competing motions under advisement.

After further considering the record submitted by the parties, the court entered an order on February 23, 2016, informing the parties of the court's concern with respect to the establishment, or lack thereof, of subject-matter jurisdiction and providing the parties with an opportunity to respond.[2]  *See* Order, Doc. No. 92.  The parties ably briefed the issue of federal jurisdiction.  Once again, the court heard argument from the parties.

## II.     FACTUAL BACKGROUND

Many of the preliminary historical facts are undisputed.[3]  For a price, patrons can board the Ben Franklin Yacht and enjoy a cruise, sometimes spanning hours in duration, on the Delaware River.  *See* Doc. No. 61-2 at ¶ 8; Doc. No. 69-4 at ¶ 8.  The vessel has three decks and comes equipped with numerous bars.  *See* Doc. No. 61-2 at ¶ 9; Doc. No. 69-4 at ¶ 9.  In normal course, interested parties book their desired cruises in advance.  *See* Doc. No. 61-2 at ¶ 10; Doc. No. 69-4 at ¶ 10.  Once on board the vessel, patrons are generally accompanied by a vessel safety

---

[2] Regarding the procedural development of the jurisdictional issue, two points bear mentioning.  First, the court raised a concern with subject-matter jurisdiction relatively early on in the litigation.  All parties agreed that subject-matter jurisdiction was secure.  No party has since raised the issue.  Second, it is not surprising that this specific jurisdictional issue only crystallized with the development of a factual record.  As will be seen, the test for admiralty tort jurisdiction (unlike the test for something like diversity jurisdiction) has the potential to slip into overlap with the merits, or at least overlap with issues that might be germane to a merits inquiry.  The Supreme Court has all but expressly recognized this dynamic.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537-38 (1995) (discussing the relationship between admiralty tort jurisdiction and the merits).  Consequently, it makes sense that the summary judgment record has necessarily provided a nice factual record with which to view jurisdiction.

[3] The court takes the following undisputed facts from Bocchino's motion for partial summary judgment and Christopher Columbus's response.  *See* Doc. Nos. 61-2 and 69-4, respectively.  Both parties have weighed in (in paragraph form) on what they view as the uncontested and contested facts.  But for one exception, the court references only the paragraph numbers in the uncontested facts sections of the parties' submissions.

4

officer, an operations manager, a captain, at least one deckhand, at least one bartender, a food server and cleaner, a dishwasher, and a chef.[4]  *See* Doc. No. 61-2 at ¶ 11; Doc. No. 69-4 at ¶ 11.

The dispute giving rise to the instant limitation proceeding occurred on the evening of May 3, 2013.  *See* Doc. No. 61-2 at ¶ 13; Doc. No. 69-4 at ¶ 13.  At that time, two parties were on board the Ben Franklin Yacht.  *See* Doc. No. 61-2 at ¶ 13; Doc. No. 69-4 at ¶ 13.  The first group consisted of "a group of people known by Edward Verzella's daughter who stated that they were on board [the vessel] to celebrate a birthday."  Doc. No. 69-4 at ¶ 13.  The boat had given this group a discounted rate.  *See* Doc. No. 61-2 at ¶ 13; Doc. No. 69-4 at ¶ 13.  The second group "was a so-called walk-up group which did not arrange for a contract in advance."  Doc. No. 61-2 at ¶ 14; *see* Doc. No. 69-4 at ¶ 14.  Although not explicitly stated as such, the parties appear to agree that Bocchino was a member of the first group.  *See* Doc. No. 61-2 at ¶ 1 in the "Contested Facts" Section; Doc. No. 69-5 at ¶ 1.

At this point, significant narrative disputes begin to emerge.  According to Bocchino,[5] his group consisted of about fifteen people and had access to an "open and unlimited bar."  Doc. No. 61-2 at ¶ 1.  In contrast, the second group was composed of about forty people, many of whom were visibly intoxicated upon boarding the vessel.  *See* Doc. No. 61-2 at ¶ 2.  Presumably connected to the discount mentioned above, this group had to pay approximately twice the amount that Bocchino's group had to pay.  *See* Doc. No. 61-2 at ¶ 3.  At some point during the

---

[4] On the night in question (which, as revealed shortly, was May 3, 2013), it is undisputed that the following vessel employees were on board the Ben Franklin Yacht: (1) Edward Verzella, vessel safety officer; (2) Christine Armstrong, operations manager; (3) Tom Bryan, captain; (4) Nicholas Cerone, deckhand; (5) Lea Johnson, bartender; (6) Tina Corley, food server and cleaner; (7) Joe Neely, dishwasher; and (8) Clay Brown, chef.  *See* Doc. No. 61-2 at ¶ 11; Doc. No. 69-4 at ¶ 11.  In addition to serving as the safety officer, Edward Verzella was also the sole owner of Christopher Columbus, LLC, an entity that, in turn, owned the Ben Franklin Yacht.  *See* Doc. No. 61-2 at ¶ 7; Doc. No. 69-4 at ¶ 7.

[5] The court references the "Contested Facts" section of Bocchino's motion for partial summary judgment.  *See* "Contested Facts" Section at 8-10, Doc. No. 61-2.  Although this section is largely devoid of citations to record *evidence*, it is useful in providing a general overview of Bocchino's version of the events.  To the extent that this version has any bearing on the jurisdictional inquiry, the court ensures that it has support in the record.

cruise, members of the second group learned of this price disparity and became angry.  *See id.*
As the bartenders continually served members of both parties more and more alcohol, there
"were several angry verbal exchanges initiated by members of the [second group] and directed at
members of [Bocchino's group]."  Doc. No. 61-2 at ¶ 5; *see* Doc. No. 61-2 at ¶ 4.  "As the boat
was coming into the pier for docking, several of the members of [Bocchino's group] were
attacked by members of the [second group]."  Doc. No. 61-2 at ¶ 5.  Instead of "rendering
assistance" to the attacked patrons, vessel employees "shoved people from both parties off of the
boat" while the fight continued.  Doc. No. 61-2 at ¶ 6.  In explaining the nature of his initial
claim in the limitation proceeding, Bocchino confirms that he seeks relief stemming from an
assault "while the vessel was in the process of docking."  Doc. No. 61-2 at ¶ 8.

  As acknowledged by Bocchino himself, Christopher Columbus denies both that an
assault of the magnitude just suggested occurred and that the bartenders served anyone who was
visibly intoxicated.  *See* Doc. No. 69-5 at ¶¶ 4, 8.[6]  Its version of the events is quite different.  At
most, according to the boat, a minor "scuffle" may have taken place.  *See* Doc. No. 69-5 at ¶ 7.
Presuming that this scuffle occurred,[7] it was one in which Bocchino voluntarily chose to enter.
*See* Doc. No. 69-6 at ¶ 21.  The scuffle "quickly ended" and did not extend beyond the confines
of the boat.[8]  Doc. No. 69-5 at ¶ 7; *see* Doc. No. 69-6 at ¶ 12.

  Some particulars surrounding these narrative divergences will aid in setting up the
jurisdictional inquiry.  There is (and given the record, can be) no dispute that the fight, if one

---

[6] The court gleans the boat's perspective both from its response to Bocchino's "Contested Facts" section and from its own statement of contested facts.  *See* Doc. Nos. 69-5 and 69-6, respectively.

[7] The boat actually denies that even a scuffle took place.  To be sure, it states that "[n]o employees of the Ben Franklin took any action to break up a scuffle which occurred when passengers were attempting to leave the vessel as no such scuffle occurred."  Doc. No. 69-6 at ¶ 15.

[8] In its accompanying memorandum of law, the vessel states that "there was a small scuffle at the time that the passengers were leaving the vessel, which started and resolved quickly, and required no involvement from the crew."  Doc. No. 69-2 at 10-11 (footnote omitted).  This statement suggests that the boat had fully docked when the scuffle took place.

occurred, erupted toward the end of the cruise.  What is more difficult to pin down is whether the fight (again presuming that one occurred) began after the boat had docked or while the boat was in the immediate process of docking.  As could be expected, the particulars themselves are shrouded in their own discrepancies.

The depositions of the boat's crew are consistent: either the crew was unaware that any altercation happened or there was something like a scuffle that broke out after the boat had docked or as the crew was in the immediate process of docking the vessel.  Indeed, while Lea Johnson (bartender) testified that she had no personal recollection of any type of fight breaking out, Christine Armstrong (operations manager) testified that an argument of some sort began as the crew was tying up the boat.  *See* Dep. of Lea Johnson at 54, Doc. No. 69-10; Dep. of Christine Armstrong at 138, 159, Doc. No. 61-10.  Meanwhile, the chef, Clay Brown, issued a written statement to the effect that he observed "a group of passengers standing around watching two other passengers in a tussle with each other."  Statement of Clayton Brown, Doc. No. 91-1.  After separating the two passengers, Mr. Brown "told one of the passengers involved in the tussle that he and his friends had to leave the vessel, which had docked."  *Id.*

On this specific issue, and putting aside any doubts concerning the actual occurrence or magnitude of the fight, the deposition testimonies of two claimants (besides Bocchino) who also allege to have been assaulted on the boat, namely Evan Medwid and James McHugh, largely fall within the range of testimony given by the crew.  As for Mr. Medwid, he testified that a couple of passengers from the other group tackled Bocchino from behind as the boat was "pretty much docked" and "pretty much stopped."  Dep. of Evan Medwin [sic][9] at 12, Doc. No. 72-1.  He further testified that Edward Verzella (vessel safety officer) yelled for people to get off the boat as the fight progressed.  *See id.* at 23-24.  In similar fashion, Mr. McHugh testified that the fight

_____
[9] It appears that the correct spelling of this claimant's name is Evan Medwid.

7

started "when the boat was docking."  Dep. of James McHugh at 24, Doc. No. 72-4.  More specifically, he testified that the fight broke out while the crew was "just beginning to dock" and that "you could feel the boat coming to a stop as the altercation ensued."  *Id.* at 27-28.

Although Bocchino's deposition testimony is doubly hard to pin down due, at least in part, to his inability to recall how certain events transpired, it does not stray far beyond the bounds of the other testimony already considered.  According to his testimony, he spent a majority of his time on the cruise talking to the deejay on the second level of the boat.  *See* Dep. of Michael Bocchino at 31, Doc. No. 69-3.  As the boat was "lining up to dock in and tie up," Bocchino returned to the first level to get something to eat.  *Id.* at 34.  At some point shortly thereafter, he heard "some kind of verbal altercation towards the back of the boat."  *Id.* at 40.  As the altercation "quickly escalated," it moved toward the front, where Bocchino intervened and was "immediately choked."  *Id.* at 40, 45.  The fight continued as the boat was "pulling up."  *Id.* at 46.  While Bocchino does not recall actually getting off the boat, he does remember being on the ground of the surrounding parking lot after the cruise had ended.  *See id.* at 48-49.  He testified that "maybe ten, [fifteen] minutes" elapsed between being choked on the vessel and getting to his car in the parking lot.[10]  *Id.* at 52.  He also testified that he was in the parking lot for "ten, [fifteen] minutes" before actually getting into his car.  *Id.* at 53.

### III.   DISCUSSION

As in every federal case, jurisdiction comes first—and here, it just so happens to come last as well.  Although the presence of the above factual disputes may seem to indicate that a jurisdictional inquiry so concerned with the maritime features of the underlying dispute requires

---

[10] To add some context, Edward Verzella testified that it took "[p]robably [fifteen] minutes" for all passengers to leave the boat.  Dep. of Edward Verzella, Sr. (Part 2) at 44, Doc. No. 61-12.  Evan Medwid stated that he was on the boat for "ten to fifteen minutes after it had docked."  Dep. of Evan Medwin [sic] at 72.

a resolution grounded in both fact and law, it turns out that the court need not venture that far.[11] This is a case where the court can determine jurisdiction by assuming without deciding that all factual disputes would be resolved in favor of a scenario that creates the best chance for jurisdiction to be established (that is, a factual scenario that would represent the outer bounds of federal jurisdiction).   In other words, rather than having to make independent factual determinations, the court can actually place a thumb on the scale in favor of the party invoking admiralty jurisdiction, namely Christopher Columbus, and still find that jurisdiction is lacking. Understood in this manner, the question for the court is one of simply deciding the legal significance of such a factual scenario.  In what follows, then, the court asks whether that factual scenario, which would have a fight breaking out between patrons, some of whom were served alcohol while visibly intoxicated by vessel employees, on board a vessel that was in the immediate process of docking, can support federal jurisdiction under the basic grant of admiralty jurisdiction in general and the current test for admiralty tort jurisdiction in particular.[12] Admitting of "some play in the joints," the answer, as just suggested, is that it cannot.  *Grubart*, 513 U.S. at 542.  Before getting to the heart of the matter, though, the court must confront two threshold arguments, for the boat argues that the court need not consult the basic grant at all.

---

[11] At oral argument, the court inquired into the factual predicate upon which jurisdiction should be tested.  At one point, Christopher Columbus responded that the jurisdictional analysis must be limited to the pleadings in general and to the underlying state court complaints in particular.  This focus on jurisdictional allegations directly clashes with the Court's discussion of jurisdictional *facts*.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537-38 (1995).  Going beyond the pleadings may therefore be required to understand "the maritime nature of the tortfeasor's activity giving rise to the incident."  *Id.* at 538 (citation omitted).  That is what happened here, just as in most cases where allegations raise a suspicion that subject-matter jurisdiction is lacking.

[12] The court recognizes that Christopher Columbus is placed in an awkward position.  To present the best jurisdictional argument possible, the vessel has to effectively argue for factual resolutions that would undermine the position that it intends to take on the merits.  That is to say, it has to characterize the events giving rise to the alleged torts one way for the purpose of attempting to establish jurisdiction (*i.e.* that there was an alleged fight that broke out as the vessel was docking) and then recharacterize those same events in another way for the purpose of establishing exoneration on the merits (*i.e.* that there was no fight or, even if there was, it had nothing to do with the boat or its employees).  Perhaps it is a situation like this that helps explain why some judges (including Judge Posner, as will be seen) continually stress the virtues of having clear and simple jurisdictional rules.

Federal jurisdiction is created by both the Constitution and Congress. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (stating that federal courts "possess only that power authorized by Constitution and statute" (citations omitted)). The Constitution creates federal judicial power over "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2, cl. 1. Congress has done its part by investing district courts with a general grant of original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). Unless presented with an alternative basis for jurisdiction, federal courts have a nondelegable duty to ensure that they are operating within the limits set by both when considering whether to award relief on the merits in an admiralty case. *See generally MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 143 (2d Cir. 2011) (applying the general rule that "federal courts have an independent obligation to . . . raise and decide jurisdictional questions that the parties either overlook or elect not to press" in an admiralty case (internal quotation marks and citations omitted)); *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 900 (11th Cir. 2004) (noting that courts "have an independent duty to ensure admiralty jurisdiction exists before applying admiralty law" (citations omitted)). For now, this general grant will remain in the background.

The boat's first threshold argument can be disposed of in swift fashion. Relying on a 1911 Supreme Court case, *Richardson v. Harmon*, 222 U.S. 96, the boat asserts that the Limitation Act contains a self-executing grant of jurisdiction. *See* Pl./Pet'r Christopher Columbus, LLC's Mem. of Law Concerning Subject-Matter Jurisdiction ("Mem. of Christopher Columbus") at 13-16, Doc. No. 95. Formally an "open question" in the Supreme Court, "[e]very Court of Appeals to reach the question . . . has concluded that the Limitation Act does not provide an independent foundation for federal admiralty jurisdiction." *MLC Fishing*, 667 F.3d at 142-43 (citations omitted). And for good reason. The Supreme Court decided *Richardson* long

before it embarked "on a mission to rein in profligate uses of 'jurisdiction,' a word with 'many, too many, meanings.'" *Herr v. United States Forest Serv.*, 803 F.3d 809, 813 (6th Cir. 2015) (Sutton, J.) (citation omitted).  The relevant language of the Limitation Act, that "[t]he owner of a vessel may bring a civil action in a district court of the United States for limitation of liability," is not ambitious enough to be of jurisdictional magnitude under the Court's current clear-statement test for jurisdictional rules.  46 U.S.C. § 30511(a); *see MLC Fishing*, 667 F.3d at 143 (agreeing that this language "gives no indication that Congress intended the Limitation Act to constitute a jurisdictional grant" (citation omitted)); *see also Herr*, 803 F.3d at 814 (explaining that courts "require the legislature to clearly state[] that a given statute implicates the judiciary's subject-matter jurisdiction" (alteration in original) (internal quotation marks and citations omitted)).  It merely creates a right of action.  *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (asserting that "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress" (citation omitted)).  The boat must therefore draw jurisdiction from another statute.

The boat's second threshold argument is that the Extension of Admiralty Jurisdiction Act ("Extension Act"), a 1948 legislative enactment designed "to gather the odd case into admiralty," is up to the task.  *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 532 (1995); *see* 46 U.S.C. § 30101(a); Mem. of Christopher Columbus at 11-13.  As evidenced by the circuit split it has caused, this argument is quite powerful and deserves a more sustained discussion.  Whatever its merits, though, this discussion is one that can only be put to rest by the Supreme Court (presuming that Congress takes no further action in this area).[13]

---

[13] The Court has three times reserved ruling on this exact issue.  *See Grubart*, 513 U.S. at 543 n.5 (reserving decision on the "alternative argument that the Extension of Admiralty Jurisdiction Act . . . provides an independent basis of federal jurisdiction"); *Sisson v. Ruby*, 497 U.S. 358, 359 n.1 (1990) (declining to consider whether "the Admiralty Extension Act . . . provides an independent basis for jurisdiction"); *Foremost Ins. Co. v. Richardson*, 457

The Extension Act provides that "[t]he admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101(a).  Because "[t]he traditional test for admiralty tort jurisdiction asked only whether the tort occurred on navigable waters," courts assumed the duty of having to define, with precision, where the underlying tort occurred. *Grubart*, 513 U.S. at 531.  Congress passed the Act in response to the "odd results" that stemmed from largely equating "[t]he location of the tort" with the location of the plaintiff's injury. *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 244-45 (2d Cir. 2014) (Katzmann, J.) (citation omitted).  Before the passage of the Act, for example, "admiralty courts lacked jurisdiction over, say, a claim following a ship's collision with a pier insofar as it injured the pier, for admiralty law treated the pier as an extension of the land." *Grubart*, 513 U.S. at 532 (citations omitted).  "The purpose of the Act," then, was to remedy this (and presumably other) peculiar situations "by investing admiralty with jurisdiction over all cases where the injury was caused by a ship or other vessel on navigable water, even if such injury occurred on land." *Id.* (internal quotation marks and citations omitted).

Read in isolation, there appears to be no obvious linguistic barrier that would prohibit a court from sensibly construing the Act as a wholly self-supporting grant of federal jurisdiction. *See Tagliere v. Harrah's Ill. Corp.*, 445 F.3d 1012, 1014 (7th Cir. 2006) (Posner, J.) (noting that the Act's "title and language suggest" as much).  Indeed, some courts, relying on *Tagliere*, have taken this path.  *See In re RQM, LLC*, No. 10 CV 5520, 2011 WL 3159150, at *4 (N.D. Ill. July 26, 2011) (stating that "[t]he Seventh Circuit has held that the location test remains the only

U.S. 668, 677 n.7 (1982) (expressing "no opinion on whether this Act could be construed to provide an independent basis for jurisdiction").

jurisdictional test when the tort in question occurs on a boat" (internal quotation marks and citations omitted)); *Northern Assurance Co. of Am. v. Allied Mason Contractors, Inc.*, No. CIV.A. 10 CV 2197, 2010 WL 2574233, at *2 (N.D. Ill. June 17, 2010) (claiming that "[w]hen a boat is involved, satisfaction of the test set forth in the Extension of Admiralty Jurisdiction Act establishes admiralty jurisdiction" (citation omitted)).

But the Act employs the word "extends," which can, with equal sense, be read to serve as a signifier that it is not operating on its own—for the jurisdiction that it is acting upon must have originated from another source. *See Lawson v. FMR LLC*, 134 S. Ct. 1158, 1165 (2014) (confirming that "[i]n determining the meaning of a statutory provision, [courts] look first to its language, giving the words used their ordinary meaning" (internal quotation marks and citation omitted)). Quite reasonably, that source would likely be the general grant of admiralty jurisdiction codified at 28 U.S.C. § 1333(1). So perhaps the Act merely qualifies the basic grant of jurisdiction, which might mean that whatever limitations are read into the basic grant would necessarily have to be read into the Act as well. *See Luckhart v. Southern Ill. Riverboat/Casino Cruises, Inc.*, No. 09-CV-422-JPG, 2010 WL 2137451, at *2 (S.D. Ill. May 27, 2010) (noting, even after *Tagliere*, that the question whether the Extension Act "*clarifies* the jurisdiction conferred by 28 U.S.C. § 1333(1) or is an independent basis of federal jurisdiction is a matter of dispute among judicial circuits" (emphasis added) (citation omitted)). Creating the promised circuit split, some courts have settled on this softer reading of the Act. *See Crotwell v. Hockman-Lewis Ltd.*, 734 F.2d 767, 768 (11th Cir. 1984) (stating that "[w]e have held that the application of [the Extension Act] is limited by . . . principles . . . which provide that admiralty jurisdiction requires that the wrong bear a significant relationship to traditional maritime activity" (internal quotation marks and citation omitted)); *Sohyde Drilling & Marine Co. v.*

*Coastal States Gas Producing Co.*, 644 F.2d 1132, 1136 (5th Cir. 1981) (concluding that the Act "was not intended to relieve [claimants] from jurisdictional constraints").  What is more, and no doubt adding some color to this split, these courts have done so by resorting to legislative history.  *See Tagliere*, 445 F.3d at 1014 (framing the split as a clash, in part, between statutory text and legislative history).

If this court occupied a different position in the Article III hierarchy, an expansive discussion of first principles spanning from statutory interpretation and legislative history to precedent and perhaps policy (for example, a discussion of the virtues of having clear jurisdictional rules) would be warranted, indeed probably required.  But, as currently positioned, this court's task is a bit more modest.  The court appreciates that this hierarchical system is in place for a reason and that district courts generally do not sit to render final pronouncements of federal law (or state law, for that matter).  Instead, this court is gifted the delicate duty of trying to initially apply relatively finished pronouncements rendered by higher courts to the unfinished business of the world.  This institutional role has been vividly expressed.  Judge Kavanaugh once began a dissent as follows: "[a]s a lower court in a system of absolute vertical stare decisis headed by one Supreme Court, it is essential that we follow both the words and the music of Supreme Court opinions. This case is controlled by at least the music, if not also the words, of the Supreme Court's decision in . . . ."  *United States v. Martinez-Cruz*, 736 F.3d 999, 1006 (D.C. Cir. 2013) (Kavanaugh, J., dissenting).  In wading through an unsettled area of federal jurisdiction, this court too must look towards the letter and spirit of any applicable Supreme Court decisions.  Although the letter of any relevant decision is, of its own force, a nonstarter,[14] a discernable spirit emerges.

---

[14] Recall, the Court explicitly reserved ruling on the nature of the Extension Act on multiple occasions.

To understand what this spirit is, one must understand what it is not—and here, Judge Posner's decision in *Tagliere* provides a useful point of departure.[15]  If that decision admits of a spirit, it is this: "the most important requirement of a jurisdictional rule is not that it appeal to common sense but that it be clear."  *Tagliere*, 445 F.3d at 1013 (citations omitted).  Judge Posner concluded that the language of the Extension Act could (and should) stand on its own because it "provides a clear and simple jurisdictional test . . . , in contrast to the vague maritime nexus (or connection) test . . . that is used to determine jurisdiction under section 1333(1), which confers but does not define admiralty jurisdiction."  *Id.* at 1014 (internal quotation marks and citation omitted).  Approaching the end of the opinion, the following key passage appears:

> We acknowledge that the distinctive substantive and procedural features of admiralty law, such as the longer statute of limitations and the absence of a right to a jury trial, were not designed for the kind of accident that occurred here, an accident that owed nothing to its maritime setting. So our suggested rule encroaches on a regulatory domain that might well be thought to belong more properly to state courts and legislatures than to federal admiralty courts. But to decide in each case whether admiralty law or state law would make a better fit with the particular circumstances of the accident that had given rise to the suit would make the determination of jurisdiction hopelessly uncertain. It is not a price worth paying for the slightly better match of law to fact that would result.

*Id.* at 1015.  For Judge Posner, the benefit of having a clear and workable jurisdictional rule grounded in the text of the Extension Act trumped whatever benefit comes with linking the jurisdictional inquiry to a determination of whether the merits of a particular dispute implicate federal interests to the point where federal jurisdiction must step in and supply the authorization for the potential displacement of state substantive law.  *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864 (1986) (stating, as a general rule, that "[w]ith admiralty jurisdiction comes the application of substantive admiralty law" (citation omitted)).

---

[15] Of some interest, Judge Posner discussed *Grubart* in a case decided before *Tagliere*.  *See Greenwell v. Aztar Ind. Gaming Corp.*, 268 F.3d 486 (7th Cir. 2001).  He did not mention the Extension Act, perhaps because it was unnecessary to do so.  But there is a suggestion in *Tagliere* that the Act was also not needed.  *See Tagliere*, 445 F.3d at 1014 (stating that the case would pass the connection test).

While Judge Posner's analysis may be correct (it certainly is admirable), it runs up against two features of the Court's most recent opinion in *Grubart* in such a way as to suggest that perhaps the Court weighed the relevant considerations a bit differently. This is no mere academic exercise, especially for the parties present before this court. It has very real practical consequences. If Judge Posner's reading of the Extension Act is correct, resolving jurisdiction is not too difficult; in the instant case, and barring a rogue interpretation of the Act, the underlying dispute would likely fall within its purview and that would be the end of the matter. If, however, the Act only qualifies the basic grant of jurisdiction, then other factors may complicate the analysis and the boat here may need to reckon with something like the "vague maritime nexus test" that Judge Posner spoke of, a test (as later explained) that is capable of drastically reducing the chances of establishing admiralty jurisdiction.

The first discrepancy lies in what the *Grubart* Court did in fact. In setting forth the applicable test for admiralty tort jurisdiction, the Court traced the evolution of the test and described the Act as modifying the rule that "the injury had to be wholly sustained on navigable waters for the tort to be within admiralty." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 532 (1995) (internal quotation marks and citation omitted). After explaining the role of the Act as a rule-modifier, the Court then stated that "the jurisdictional rule was *qualified again* in three decisions of this Court." *Id.* (emphasis added).[16] In using the words "qualified again," the Court seemed to suggest that the Act's import has not been immune to whatever principles the Court laid down in later cases. In other words, and to the extent that those principles do not emanate from the Act itself, the Court appeared to signal that the Act operates within the confines of a broader jurisdictional regime.

---

[16] In keeping with this rule-modifier theme, the Court also made reference to the Extension Act in stating that "[c]ertainly Congress did not think a land-based party necessarily diluted the need for admiralty jurisdiction *or it would have kept its hands off the primitive location test*." *Id.* at 545 (emphasis added).

That is not all the Court did.  The Court actually relied on the Act in applying the first part of the admiralty tort jurisdiction test, namely the location test, to the operative facts.  *See Grubart*, 513 U.S. at 535-38; *see also Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 247 (2d Cir. 2014) (recounting that the *Grubart* Court "held that the location test was met because the alleged injury, though occurring on land, was proximately caused by a vessel on navigable water; the location of the tort was therefore within the bounds of admiralty as defined by the Extension of Admiralty Jurisdiction Act" (citations omitted)).  Without any hint whatsoever of the possibility that the analysis could end with a finding that the matter fell within the scope of the Act, the Court went on to apply the second part of the test, namely the connection test.  *See Grubart*, 513 U.S. at 538-43.  Given footnote five, the Court was obviously aware of the argument that the Act should be read as a self-sustaining grant of jurisdiction.  *See Grubart*, 513 U.S. at 543 n.5 (declining to pass upon this argument).  With the argument's potential to radically alter the jurisdictional analysis, one might have reasonably expected the Court to provide at least some insight into its merits had it been an argument worth serious consideration.  The Court, after all, routinely responds to arguments not formally presented to provide guidance to lower courts.  Unfortunately, no such guidance surfaced.

The second variation is of a more aspirational kind.  As already shown, Judge Posner concluded that a jurisdictional rule that is contingent on figuring out whether substantive admiralty law is actually needed in a case is not worth it if the clarity of the rule suffers.  If that were truly the spirit driving *Grubart*, even though the ultimate outcome may have remained the same, the Court would have likely employed a different line of reasoning (or at least different language).  Indeed, it is difficult to meaningfully reconcile the *Grubart* Court's acknowledgement that there is no categorical rule establishing that there is admiralty jurisdiction

17

over "every tort involving a vessel on navigable waters" with the type of categorical rule that Judge Posner interpreted the Act as embodying. *Grubart*, 513 U.S. at 543. It is thus unmistakable that "[i]n developing the modern test for admiralty tort jurisdiction, the Supreme Court" "sought to realign the jurisdictional inquiry toward the primary purpose that supports admiralty jurisdiction." *Tandon*, 752 F.3d at 253 (citations omitted). To be sure, the Court noted that the connection test is "aimed at the same objectives invoked to support a new multifactor test, the elimination of admiralty jurisdiction where the rationale for the jurisdiction does not support it." *Grubart*, 513 U.S. at 544-45. And in *Sisson v. Ruby*, 497 U.S. 358 (1990), the case that crystallized the connection test, the Court addressed Judge Posner's concern head on: "[t]he demand for tidy rules can go too far, and when that demand entirely divorces the jurisdictional inquiry from the purposes that support the exercise of jurisdiction, it *has* gone too far." *Id.* at 364 n.2 (emphasis in original).[17]

All of this is just to say that if *Tagliere* has, or has not, pushed too far, it is for the Supreme Court, and not this one, to say so. One could put it this way. Expressing dissatisfaction with the Court's formulation of the then-current test, Justice Scalia's separate opinion in *Sisson* and Justice Thomas's separate opinion in *Grubart* shared concerns similar to those expressed by Judge Posner. *See Sisson*, 497 U.S. at 368, 374-75 (Scalia, J., concurring in the judgment) (disclaiming the test employed by the Court in part because it lacked the characteristics of a clear jurisdictional rule); *see also Grubart*, 513 U.S. at 549 (Thomas, J., concurring in the judgment) (same). Yet neither Justice Scalia nor Justice Thomas invoked the Extension Act as a possible way to alleviate their concerns. Justice Thomas even suggested that *Sisson* should be overruled. *See Grubart*, 513 U.S. at 554 (stating that "this Court does not owe *Sisson* the benefit of *stare*

---

[17] There is much to be said for the idea that Judge Posner grounded his "tidy rule" in the text of a statute. But it must be remembered that, in constructing the current test for admiralty tort jurisdiction, the Court too has been interpreting a statute. *See* 28 U.S.C. § 1333(1).

*decisis*").   In the end, if the Court is content in demarcating admiralty jurisdiction solely by interpreting its basic grant, so too is this court.   Only the Court can alter the terms of the debate.[18]   Because no facet of that debate has moved beyond the basic grant (despite noted opportunities), the court, not without reservation, declines to read the Extension Act as a wholly independent basis of jurisdiction.

And that, of course, brings the general grant back to the forefront—for it is only by satisfying its potentially more rigorous dictates that Christopher Columbus can litigate in federal court.   Judge Katzmann has nicely summarized those dictates as they apply to tort claims:

> The test established in *Grubart* remains the current test for admiralty jurisdiction over claims sounding in tort. . . . To restate: First, we ask whether the alleged tort meets the location test: that is, whether it occurred on navigable water or was caused by a vessel on navigable water. Second, we ask whether the alleged tort meets both subparts of the connection test: that is, whether the general type of incident involved has a potentially disruptive effect on maritime commerce, and whether the general character of the activity giving rise to the incident bears a substantial relationship to traditional maritime activity. . . . Only if the location test and both subparts of the connection test are met will admiralty tort jurisdiction be proper under 28 U.S.C. § 1333(1).

*Tandon*, 752 F.3d at 248 (citations omitted).   No claimant has challenged the boat's ability to satisfy either the location test or the second subpart of the connection test.   *See* Br. of Claimant, Michael Bocchino on the Issue of Subject-Matter Jurisdiction ("Bocchino's Br.") at 6-7, Doc. No. 94.   The court therefore confines the analysis to the first subpart, which requires the court to "assess the general features of the type of incident involved" and "determine whether the incident has a potentially disruptive impact on maritime commerce."   *Grubart*, 513 U.S. at 534 (internal quotation marks and citations omitted).

---

[18] Third Circuit precedent has not provided much guidance.  For what it is worth, the Third Circuit has (relatively recently) described the Extension Act as "creat[ing] the second part of the location test."  *Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co.*, 436 F.3d 349, 355 n.13 (3d Cir. 2006).

The court begins by describing the incident's "general character." *Sisson*, 497 U.S. at 363. In doing so, the court must craft "a description of the incident at an intermediate level of possible generality." *Grubart*, 513 U.S. at 538.[19] The description "should be general enough to capture the possible effects of similar incidents on maritime commerce, but specific enough to exclude irrelevant cases." *Tandon*, 752 F.3d at 249. Moreover, not only should the description "look[] to the nature of the incident that immediately caused the underlying injury," but it should also focus on "the general location of the incident and the roles of the persons involved, both of which can be relevant to the potential effect on maritime commerce." *Id.* at 249, 250-51 (alteration added) (citations omitted). With these guideposts in mind, the court concludes that the best factual scenario in support of jurisdiction should be described as something like a physical altercation among recreational passengers on board a vessel that is in the immediate process of docking.[20]

Both the boat and Bocchino offer their own version of the proper characterization. Christopher Columbus describes the incident as "an injury to passengers aboard a vessel on navigable waters." Mem. of Christopher Columbus at 1, 5. Bocchino has the incident as "a physical altercation among recreational passengers on a vessel that is in the immediate process of docking at an isolated location." Bocchino's Br. at 7. Because Bocchino's description adds nothing of real substance, and likely takes the "general location" consideration too far, the court takes a moment to respond to the boat's description.

---

[19] In his separate opinion in *Grubart*, Justice Thomas stated that "[t]he majority does not explain the origins of levels of generality, nor, to my knowledge, do we employ such a concept in other areas of jurisdiction." *Id.* at 553 (internal quotation marks omitted). And Judge Kozinski has forthrightly recognized "that disputes about the appropriate level of generality always carry with them a certain degree of arbitrariness." *Delta Country Ventures, Inc. v. Magana*, 986 F.2d 1260, 1264 (9th Cir. 1993) (Kozinski, J., dissenting).

[20] The status of the boat as a pleasure boat appears to be immaterial. *See Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 179 (3d Cir. 1995) (*en banc*) (asserting that "[a]lthough this case involves a pleasure boat rather than a vessel engaged in commercial shipping, that fact does not affect the jurisdictional result"); *Delta Country*, 986 F.2d at 1266 (Kozinski, J., dissenting) (noting that "the fact that the vessel here is a 'pleasure boat' makes it no less susceptible to maritime jurisdiction than any other vessel").

If the boat's version is correct, one wonders what work the connection test is supposed to do for "an injury to passengers aboard a vessel on navigable waters" sounds an awful lot like the language employed in the Extension Act, which, for current purposes, appears to be relevant only to the location test.  *See* 46 U.S.C. § 30101(a) (providing that "[t]he admiralty and maritime jurisdiction of the United States extends to and includes cases of *injury or damage, to person or property, caused by a vessel on navigable waters*" (emphasis added)).  If the true purpose of the connection test is "to weed out torts without a maritime connection," it does not make too much sense, as a matter of first principles, to have that test track a "congressional modification" designed "to gather the odd case *into* admiralty."  *Grubart*, 513 U.S. at 532, 542 n.4 (emphasis added).

At a more superficial level, the boat's description is too general to be of any real use or, in the words of the *Grubart* Court, "too general to differentiate cases."  *Id.* at 538.  In *Grubart*, the Court described the underlying incident as "damage by a vessel in navigable water to an underwater structure."  *Id.* at 539.  In *Sisson*, the Court described the underlying incident as "a fire on a vessel docked at a marina on navigable waters."  *Sisson*, 497 U.S. at 363.  And in *Tandon*, the Second Circuit described the underlying incident as "a physical altercation among recreational visitors on and around a permanent dock surrounded by navigable water."  *Tandon*, 752 F.3d at 249.[21]  In all of these cases, the description moved beyond the level of generality contained in the Extension Act.  Just as one cannot abstract away the maritime setting of the alleged wrongdoing, so too one cannot abstract away any semblance of the tortfeasor's activity.

---

[21] It is true, as the boat points out, that the Third Circuit has described an incident as "damage by a vessel in navigable water to [a seaman]."  *Neely*, 63 F.3d at 179 (alteration in original) (internal quotation marks and citation omitted).  Without explanation, though, the Third Circuit later described an incident as "Sinochem's alleged misrepresentations to the Chinese Admiralty Court that led to the arrest of the Vessel at port."  *Malaysia Int'l Shipping Corp. v. Sinochem Int'l Co.*, 436 F.3d 349, 356 (3d Cir. 2006).  Without more guidance, then, these cases, when read together, do not collectively serve to alter the above analysis.

Otherwise, it is hard to imagine how one could be in the business of weeding out torts with any sense of precision.  The court is therefore comfortable in relying on a description of the incident that embodies the core features of both its maritime and tort settings.

The court next considers whether a physical altercation among recreational passengers on board a vessel that is in the immediate process of docking has "the potential to disrupt maritime commerce."  *Grubart*, 513 U.S. at 538.  "In so doing, [the court] look[s] not to the particular facts of the case before [it]—i.e., whether maritime commerce was actually disrupted here—but to whether similar occurrences are likely to be disruptive."  *Tandon*, 752 F.3d at 249 (alterations added).  "The overall purpose of the exercise is to determine whether the incident could be seen within a class of incidents that pose[] more than a fanciful risk to commercial shipping."  *Id.* (alteration in original) (internal quotation marks and citation omitted).

In line with *Tandon*, the court concludes "that this type of incident does not realistically pose a threat to maritime commerce."  *Id.*  Perhaps ironically, a passage from *Tagliere* will provide initial instruction:

> An injury to a crewmember is somewhat more likely to affect maritime commerce than an injury to a passenger, because the crewmember might be vital to the operation of the boat and difficult to replace immediately. Yet even an injury to a passenger could have a disruptive effect, if the boat had to make an unscheduled stop to get him to a hospital (not that that could have happened here, since the boat was moored), or if the injury revealed a dangerous condition that required time-consuming repairs.

*Tagliere v. Harrah's Ill. Corp.*, 445 F.3d 1012, 1015 (7th Cir. 2006).  Building off this foundation, one could take a sliding-scale approach to the question.  If the injury is to a crewmember, then other factors may matter less, such as whether the boat is out at sea (thus presenting the possibility of something like an unscheduled stop to a hospital).  If, on the other

hand, the injury is to a passenger, then maybe these other factors have a larger role to play. Here, although the incident involved injuries to passengers, the boat was not out at sea.

The court can be more concrete.  One is hard pressed to understand how the characterized incident poses a realistic threat to either "the free passage of commercial ships along navigable waterways," "the course of the waterway itself," or the integrity of "nearby commercial vessels." *Tandon*, 752 F.3d at 249 (citation omitted).  And it is worth emphasizing that it is only a realistic threat, not a "fanciful risk," that matters.  *Grubart*, 513 U.S. at 539.  Even though the fight occurred on a vessel, the vessel was in the immediate process of docking.  As a result, the incident is not of a nature where there is a realistic possibility that the fight "may distract the crew from their duties, endangering the safety of the vessel *and risking collision with others on the same waterway*."  *Tandon*, 752 F.3d at 250 (emphasis added).  Likewise, there is no realistic possibility that the boat "may be forced to divert from its course to obtain medical care for the injured person."  *Id.*  A passage from *Tandon* drives the point home:

> At worst, an incident of this sort might temporarily prevent commercial vessels from mooring at the permanent dock around which the fight occurred. . . . But the potential impact of such a temporary disruption is simply too meager to support jurisdiction. The fire considered in *Sisson* might have damaged a marina enough to close it for days or weeks, or even permanently; a fistfight presents no similar danger. At worst, it might prevent commercial ships from using part of a dock for a few hours. We do not think that this slight possibility of a temporary inconvenience is the potentially disruptive impact on maritime commerce envisioned by the Supreme Court's test.

*Id.* at 252 (internal quotation marks and citations omitted).  As this passage highlights, there is no doubt that a physical altercation among recreational passengers on board a vessel that is in the immediate process of docking poses a risk to commercial shipping.  The question, though, is whether that risk is something "more than fanciful."  *Id.* at 252 n.8.  When tempered by common

sense, the risk falls short.[22]   Accordingly, and because Christopher Columbus cannot satisfy the first subpart of the connection test, the court is compelled to dismiss this limitation action for lack of subject-matter jurisdiction.

One final word is in order.  When courts have found that jurisdiction is lacking under 28 U.S.C. § 1333(1), they have noted that "[n]ot all torts that happen on or over navigable water have the potential to disrupt commercial shipping."  *Id.* 251.  The conclusion that jurisdiction is lacking readily follows from that general proposition.  But even when the opposite conclusion is reached, Justices and judges alike have strived to keep the general proposition alive.  *See Grubart*, 513 U.S. at 543 (stating that "[a]lthough we agree with petitioners that these cases do not say that every tort involving a vessel on navigable waters falls within the scope of admiralty jurisdiction no matter what, they do show that *ordinarily* that will be so" (emphasis added) (footnote omitted)); *Delta Country Ventures, Inc. v. Magana*, 986 F.2d 1260, 1265 (9th Cir. 1993) (Kozinski, J., dissenting) (stating that "[m]any things that take place on or about vessels wouldn't support admiralty jurisdiction" (citations omitted)).   "General propositions do not decide concrete cases."  *Lochner v. New York*, 198 U.S. 45, 76 (1905) (Holmes, J., dissenting). But they sure help.

## IV.   CONCLUSION

Despite the lurking of interesting questions of substantive law, this case is first and foremost a case about jurisdiction, which means that it is a case about power.  *Olympia Exp., Inc. v. Linee Aeree Italiane, S.P.A.*, 509 F.3d 347, 350 (7th Cir. 2007) (Posner, J.) (recognizing, "as Holmes famously said," that "[j]urisdiction is power" (citations omitted)).   As a descriptive matter, Justice Thomas once remarked that understanding admiralty tort jurisdiction is an

---

[22] "As it actually turned out in this suit," maritime commerce was not impacted in the slightest.  *Grubart*, 513 U.S. at 539.

exercise in defining "the line between federal admiralty jurisdiction and state power." *Grubart*, 513 U.S. at 549.  As it has unfolded, and not without legitimate criticism, that exercise has essentially been one in drawing "the line more finely, case by case." *Sisson v. Ruby*, 497 U.S. 358, 372 (1990) (Scalia, J., concurring in the judgment).  In sharpening this line-drawing with the facts of this case, the court has kept in mind why the line must be drawn—to vindicate "the primary purpose that supports admiralty jurisdiction (namely, the federal interest in the protection of maritime commerce)" without needlessly suffocating state power.  *Tandon*, 752 F.3d at 253 (2d Cir. 2014) (alteration added) (internal quotation marks and citation omitted).  To put it somewhat more bluntly, federal courts should hesitate before assuming admiralty jurisdiction "over cases better heard in state court."  *Id.* at 254 n.11.  By concluding that the general run of cases involving fights between patrons on board vessels that are in the immediate process of docking presents concerns that are too remote from those underlying the primary purpose of admiralty jurisdiction, the court has heeded the call.

The court will issue a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.